Manny A. Frade (MF7590)
Max Rayetsky (MR1986)
Meltzer Lippe, Goldstein & Breitstone, LLP
*Attorneys for Plaintiff*
*Prime Contractors Inc.*
190 Willis Avenue
Mineola, New York 11501
Telephone: (516) 747-0300
Facsimile: (516) 747-0653
mfrade@meltzerlippe.com
mrayetsky@meltzerlippe.com

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| PRIME CONTRACTORS INC., | Civil Action No. |
| Plaintiff, | |
| - against - | VERIFIED COMPLAINT |
| APS CONTRACTORS INC., GOCE BLAZESKI, and NORTH AMERICAN SPECIALTY INSURANCE COMPANY, | Jury Trial Demanded |
| Defendants. | |

Plaintiff Prime Contractors Inc. ("Plaintiff" and/or "Prime"), by and through its attorneys,

Meltzer Lippe, Goldstein & Breitstone, LLP, for its Verified Complaint against Defendants APS

Contractors Inc. ("APS"), Goce Blazeski ("Mr. Blazeski") and North American Specialty

Insurance Company ("NASIC," and together with APS and Mr. Blazeski, collectively, the

"Defendants"), alleges as follows:

## **JURISDICTION**

1.      This Court has subject matter jurisdiction over the above-captioned action (the

"Action") pursuant to 28 U.S.C. § 1332(a)(1) because this is a civil action between citizens of

different States and the amount in controversy exceeds the sum or value of $75,000, exclusive of

interest and costs.

## VENUE

2.      The venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Prime's claims occurred, or a substantial part of property that is the subject of the Action is situated in this judicial district.

## PARTIES

3.      Prime is, and, at all times relevant to this Action, was, a corporation organized and existing under the laws of the State of New York, with its principal place of business located at 135-42 Ozone Park, New York 11420.

4.      Upon information and belief, APS is, and, at all times relevant to this Action, was a corporation organized and existing under the laws of the State of New Jersey, with its principal place of business located at 27 East 33rd Street, Paterson, New Jersey 07514.

5.      Upon information and belief, Mr. Blazeski is, and, at all times relevant to this Action, was, a resident of the State of New Jersey, regularly conducting and transacting business in the State of New York.

6.      Upon information and belief, Mr. Blazeski is, and, at all times relevant to this Action, was, the President, owner, principal, officer and/or director of APS.

7.      Upon information and belief, NASIC is, and, at all times relevant to this Action, was, an insurance company licensed to issue labor and material payment bonds in the State of New York, with its principal place of business located at 1650 Market Street, Philadelphia, Pennsylvania 19106.

## FACTS

### I.      The Breukelen Houses Project

8.      Upon information and belief, on or about March 15, 2018, the New York City

2

Housing Authority ("NYCHA"), as owner, and APS, as general contractor, entered into two (2) separate written agreements (Contract No. RF1625124 ("NYCHA-APS Contract No. 1") and Contract No. RF1625126 ("NYCHA-APS Contract No. 2," and together with NYCHA-APS Contract No. 1, collectively, the "NYCHA-APS Contract")), whereby APS was required to restore the building envelopes of thirty-two (32) buildings at the Breukelen Houses public housing complex located in Brooklyn, New York (the "Breukelen Houses Project").

9.      Upon information and belief, prior to the execution of the NYCHA-APS Contract, on or about January 12, 2017, APS, as principal, and NASIC, as surety, issued to NYCHA, as owner, two (2) separate payment bonds (Bond No. 2255138, "Bond No. 1" and Bond No. 2255139, "Bond No. 2," and together with Bond No. 1, collectively, the "Bond") in the amount of $30,962,247.33 and $25,930,668.98, respectively, for the pecuniary protection of all persons furnishing labor and supplying materials, equipment and/or services in connection with the Breukelen Houses Project.

10.     Bond No. 1 provides, in pertinent part:

> … [APS] … **shall promptly pay** or cause to be paid all lawful claims [in connection with NYCHA-APS Contract No. 1] for[:]
>
> (a) Wages and **compensation for labor performed and services rendered by all persons engaged in the prosecution of the work under [NYCHA-APS Contract No. 1]**, …. whether such persons be agents, servants or employees of [APS] …, including **all persons so engaged who perform the work of laborers or mechanics at or in the vicinity of the site of … [Breukelen Houses Project No. 1]** regardless of any contractual relationship between [APS] … and such laborers or mechanics …;
>
> (b) **Materials and supplies (whether incorporated in the permeant structure or not), as well as equipment, … or machinery furnished, used … by [APS] … at or in the vicinity of the site of … [Breukelen Houses Project No. 1]** in the prosecution of the Work under [NYCHA-APS Contract No. 1] … [.]

4875-9776-8459, v. 3

…

Bond No. 1 is subject to the following additional conditions, limitations and agreements:

(a) [APS] and [NASIC] agree that *[Bond No. 1] shall be for the benefit of any [m]aterial man or laborer having a just claim* … .

(b) All persons who have performed labor, rendered services or furnished materials and supplies … shall have a *direct right of action against [APS] and … [NASIC]*, or against either or both of them … .

11. Bond No. 2 provides, in pertinent part:

… [APS] … *shall promptly pay* or cause to be paid all lawful claims [in connection with NYCHA-APS Contract No. 2] for[:]

(a) Wages and *compensation for labor performed and services rendered by all persons engaged in the prosecution of the work under [NYCHA-APS Contract No. 2]*, …. whether such persons be agents, servants or employees of [APS] …, including *all persons so engaged who perform the work of laborers or mechanics at or in the vicinity of the site of … [Breukelen Houses Project No. 2]* regardless of any contractual relationship between [APS] … and such laborers or mechanics …;

(b) *Materials and supplies (whether incorporated in the permeant structure or not), as well as equipment, … or machinery furnished, used … by [APS] … at or in the vicinity of the site of … [Breukelen Houses Project No. 2]* in the prosecution of the Work under [NYCHA-APS Contract No. 2] … [.]

…

Bond No. 2 is subject to the following additional conditions, limitations and agreements:

(a) [APS] and [NASIC] agree that *[Bond No. 2] shall be for the benefit of any [m]aterial man or laborer having a just claim* … .

(b) All persons who have performed labor, rendered services or furnished materials and supplies … shall have a *direct right of action against [APS] and … [NASIC]*, or against either or both

4

of them … .

(Emphases added.)

## II.     The APS-Prime Sidewalk Shed Subcontract

12.     APS, as general contractor, and Prime, as subcontractor, entered into an oral agreement (the "APS-Prime Sidewalk Shed Subcontract No. 1"), whereby APS was required to, among other things, furnish, install, rent and, subsequently, dismantle sidewalk sheds for the following six (10) buildings at the Breukelen Houses Project (the "Initial Sidewalk Shed Buildings"):

(i)      Building No. 1;
(ii)     Building No. 2;
(iii)    Building No. 3;
(iv)     Building No. 4;
(v)      Building No. 5;
(vi)     Building No. 14;
(vii)    Building No. 15;
(viii)   Building No. 16;
(ix)     Building No. 17; and
(x)      Building No. 18.

13.     In addition, on or about March 7, 2019, APS, as general contractor, and Prime, as subcontractor, entered into a written agreement (the "APS-Prime Sidewalk Shed Subcontract No. 2," and together with APS-Prime Sidewalk Shed Subcontract No. 1, collectively, the "APS-Prime Sidewalk Shed Subcontract"), whereby APS was required to, among other things, furnish, install, rent and, subsequently, dismantle sidewalk sheds for the following additional six (6) buildings at the Breukelen Houses Project (the "Additional Sidewalk Shed Buildings," and together with the Initial Sidewalk Shed Buildings, collectively, the "Sidewalk Shed Buildings"):

(i)      Building No. 6;
(ii)     Building No. 7;
(iii)    Building No. 13;
(iv)     Building No. 23;
(v)      Building No. 24; and
(vi)     Building No. 26.

4875-9776-8459, v. 3

14.     After entering into the APS-Prime Sidewalk Shed Subcontract, APS and/or Mr. Blazeski removed Building No. 23 from Prime's scope of work.

15.     The mutually agreed-upon rate for Prime's *installation* of sidewalk sheds at the Sidewalk Shed Buildings was $137.00 per *linear* foot.

16.     The mutually agreed-upon rate for Prime's monthly *rental* of the installed sidewalk sheds at the Sidewalk Shed Buildings was 5% from the total cost of the installed sidewalk sheds, plus tax.

17.     After entering into the APS-Prime Sidewalk Shed Subcontract, APS and/or Mr. Blazeski furnished Prime with the following linear footage for each of the Sidewalk Shed Buildings:

(i)      Building No. 1 – 414 linear feet;
(ii)     Building No. 2 – 258 linear feet;
(iii)    Building No. 3 – 268 linear feet;
(iv)     Building No. 4 – 322 linear feet;
(v)      Building No. 5 – 216 linear feet;
(vi)     Building No. 6 – 181 linear feet;
(vii)    Building No. 7 – 240 linear feet;
(viii)   Building No. 13 – 226 linear feet;
(ix)     Building No. 14 – 493 linear feet;
(x)      Building No. 15 – 204 linear feet;
(xi)     Building No. 16 – 229 linear feet;
(xii)    Building No. 17 – 250 linear feet;
(xiii)   Building No. 18 – 266 linear feet;
(xiv)    Building No. 24 – 371 linear feet; and
(xv)     Building No. 26 – 251 linear feet.

18.     On or before August 15, 2018, Prime duly installed 414 linear feet of a sidewalk shed at Building No. 1 of the Sidewalk Shed Buildings.

19.     On or before July 23, 2018, Prime duly installed 258 linear feet of a sidewalk shed at Building No. 2 of the Sidewalk Shed Buildings.

20.     On or before July 23, 2018, Prime duly installed 268 linear feet of a sidewalk shed

at Building No. 3 of the Sidewalk Shed Buildings.

21.     On or before October 3, 2018, Prime duly installed 322 linear feet of a sidewalk shed at Building No. 4 of the Sidewalk Shed Buildings.

22.     On or before August 28, 2018, Prime duly installed 216 linear feet of a sidewalk shed at Building No. 5 of the Sidewalk Shed Buildings.

23.     On or before July 26, 2019, Prime duly installed 181 linear feet of a sidewalk shed at Building No. 6 of the Sidewalk Shed Buildings.

24.     On or before July 26, 2019, Prime duly installed 240 linear feet of a sidewalk shed at Building No. 7 of the Sidewalk Shed Buildings.

25.     On or before July 23, 2018, Prime duly installed 226 linear feet of a sidewalk shed at Building No. 13 of the Sidewalk Shed Buildings.

26.     On or before August 15, 2018, Prime duly installed 493 linear feet of a sidewalk shed at Building No. 14 of the Sidewalk Shed Buildings.

27.     On or before July 23, 2018, Prime duly installed 204 linear feet of a sidewalk shed at Building No. 15 of the Sidewalk Shed Buildings.

28.     On or before July 23, 2018, Prime duly installed 229 linear feet of a sidewalk shed at Building No. 16 of the Sidewalk Shed Buildings.

29.     On or before July 23, 2018, Prime duly installed 250 linear feet of a sidewalk shed at Building No. 17 of the Sidewalk Shed Buildings.

30.     On or before August 15, 2018, Prime duly installed 266 linear feet of a sidewalk shed at Building No. 18 of the Sidewalk Shed Buildings.

31.     On or before August 7, 2019, Prime duly installed 371 linear feet of a sidewalk shed at Building No. 24 of the Sidewalk Shed Buildings.

4875-9776-8459, v. 3

32.     On or before August 15, 2019, Prime duly installed 251 linear feet of a sidewalk shed at Building No. 26 of the Sidewalk Shed Buildings.

33.     On or about September 16, 2020, the installed sidewalk shed at Building No. 2 of the Sidewalk Shed Buildings was duly dismantled.

34.     On or about September 28, 2020, the installed sidewalk shed at Building No. 3 of the Sidewalk Shed Buildings was duly dismantled.

35.     On or about October 15, 2020, the installed sidewalk shed at Building No. 4 of the Sidewalk Shed Buildings was duly dismantled.

36.     On or about October 27, 2020, the installed sidewalk shed at Building No. 5 of the Sidewalk Shed Buildings was duly dismantled.

37.     On or about December 2, 2020, the installed sidewalk shed at Building No. 15 of the Sidewalk Shed Buildings was duly dismantled.

38.     On or about December 3, 2020, the installed sidewalk shed at Building No. 16 of the Sidewalk Shed Buildings was duly dismantled.

39.     On or about December 23, 2020, the installed sidewalk shed at Building No. 17 of the Sidewalk Shed Buildings was duly dismantled.

40.     On or about January 27, 2021, the installed sidewalk shed at Building No. 18 of the Sidewalk Shed Buildings was duly dismantled.

41.     To date, the installed sidewalk shed at Building No. 1 of the Sidewalk Shed Buildings has not been dismantled and remains to be in use.

42.     To date, the installed sidewalk shed at Building No. 6 of the Sidewalk Shed Buildings has not been dismantled and remains to be in use.

43.     To date, the installed sidewalk shed at Building No. 7 of the Sidewalk Shed

4875-9776-8459, v. 3

Buildings has not been dismantled and remains to be in use.

44.     To date, the installed sidewalk shed at Building No. 13 of the Sidewalk Shed Buildings has not been dismantled and remains to be in use.

45.     To date, the installed sidewalk shed at Building No. 14 of the Sidewalk Shed Buildings has not been dismantled and remains to be in use.

46.     To date, the installed sidewalk shed at Building No. 24 of the Sidewalk Shed Buildings has not been dismantled and remains to be in use.

47.     To date, the installed sidewalk shed at Building No. 26 of the Sidewalk Shed Buildings has not been dismantled and remains to be in use.

48.     The Defendants have failed, and continue to fail, to pay Prime for the installation of the sidewalk shed at Building No. 1 of the Sidewalk Shed Buildings in the amount of at least $56,718.00.

49.     The Defendants have failed, and continue to fail, to pay Prime for the rental of the sidewalk shed at Building No. 1 of the Sidewalk Shed Buildings for the period from March 21, 2019 until and through the present in the total amount of at least $104,977.93 (inclusive of tax).

50.     The Defendants have failed, and continue to fail, to pay Prime for the installation and dismantling of the sidewalk shed at Building No. 2 of the Sidewalk Shed Buildings in the amount of at least $35,346.00.

51.     The Defendants have failed, and continue to fail, to pay Prime for the rental of the sidewalk shed at Building No. 2 of the Sidewalk Shed Buildings for the period from March 21, 2019 until and through September 16, 2020 in the total amount of at least $34,378.11 (inclusive of tax).

52.     The Defendants have failed, and continue to fail, to pay Prime for the installation

4875-9776-8459, v. 3

and dismantling of the sidewalk shed at Building No. 3 of the Sidewalk Shed Buildings in the amount of at least $36,716.00.

53.     The Defendants have failed, and continue to fail, to pay Prime for the rental of the sidewalk shed at Building No. 3 of the Sidewalk Shed Buildings for the period from March 21, 2019 until and through September 28, 2020 in the total amount of at least $36,443.46 (inclusive of tax).

54.     The Defendants have failed, and continue to fail, to pay Prime for the installation and dismantling of the sidewalk shed at Building No. 4 of the Sidewalk Shed Buildings in the amount of at least $44,144.00.

55.     The Defendants have failed, and continue to fail, to pay Prime for the rental of the sidewalk shed at Building No. 4 of the Sidewalk Shed Buildings for the period from March 21, 2019 until and through October 15, 2020 in the total amount of at least $45,197.42 (inclusive of tax).

56.     The Defendants have failed, and continue to fail, to pay Prime for the installation and dismantling of the sidewalk shed at Building No. 5 of the Sidewalk Shed Buildings in the amount of at least $29,592.00.

57.     The Defendants have failed, and continue to fail, to pay Prime for the rental of the sidewalk shed at Building No. 5 of the Sidewalk Shed Buildings for the period from March 21, 2019 until and through October 27, 2020 in the total amount of at least $30,983.26 (inclusive of tax).

58.     The Defendants have failed, and continue to fail, to pay Prime for the installation of the sidewalk shed at Building No. 6 of the Sidewalk Shed Buildings in the amount of at least $24,797.00.

4875-9776-8459, v. 3

59.     The Defendants have failed, and continue to fail, to pay Prime for the rental of the sidewalk shed at Building No. 6 of the Sidewalk Shed Buildings for the period from December 27, 2019 until and through the present in the total amount of at least $34,683.34 (inclusive of tax).

60.     The Defendants have failed, and continue to fail, to pay Prime for the installation of the sidewalk shed at Building No. 7 of the Sidewalk Shed Buildings in the amount of at least $32,880.00.

61.     The Defendants have failed, and continue to fail, to pay Prime for the rental of the sidewalk shed at Building No. 7 of the Sidewalk Shed Buildings for the period from December 27, 2019 until and through the present in the total amount of at least $44,894.69 (inclusive of tax).

62.     The Defendants have failed, and continue to fail, to pay Prime for the installation of the sidewalk shed at Building No. 13 of the Sidewalk Shed Buildings in the amount of at least $30,962.00.

63.     The Defendants have failed, and continue to fail, to pay Prime for the rental of the sidewalk shed at Building No. 13 of the Sidewalk Shed Buildings for the period from March 21, 2019 until and through the present in the total amount of at least $57,306.79 (inclusive of tax).

64.     The Defendants have failed, and continue to fail, to pay Prime for the installation and dismantling of the sidewalk shed at Building No. 14 of the Sidewalk Shed Buildings in the amount of at least $67,541.00.

65.     The Defendants have failed, and continue to fail, to pay Prime for the rental of the sidewalk shed at Building No. 14 of the Sidewalk Shed Buildings for the period from March 21, 2019 until and through January 21, 2022 in the total amount of at least $125,009.95 (inclusive of tax).

66.     The Defendants have failed, and continue to fail, to pay Prime for the installation

4875-9776-8459, v. 3

and dismantling of the sidewalk shed at Building No. 15 of the Sidewalk Shed Buildings in the amount of at least $27,948.00.

67.     The Defendants have failed, and continue to fail, to pay Prime for the rental of the sidewalk shed at Building No. 15 of the Sidewalk Shed Buildings for the period from March 21, 2019 until and through November 3, 2020 in the total amount of at least $29,566.25 (inclusive of tax).

68.     The Defendants have failed, and continue to fail, to pay Prime for the installation and dismantling of the sidewalk shed at Building No. 16 of the Sidewalk Shed Buildings in the amount of at least $31,373.00.

69.     The Defendants have failed, and continue to fail, to pay Prime for the rental of the sidewalk shed at Building No. 16 of the Sidewalk Shed Buildings for the period from March 21, 2019 until and through November 5, 2020 in the total amount of at least $41,409.68 (inclusive of tax).

70.     The Defendants have failed, and continue to fail, to pay Prime for the installation and dismantling of the sidewalk shed at Building No. 17 of the Sidewalk Shed Buildings in the amount of at least $34,250.00.

71.     The Defendants have failed, and continue to fail, to pay Prime for the rental of the sidewalk shed at Building No. 17 of the Sidewalk Shed Buildings for the period from March 21, 2019 until and through December 10, 2020 in the total amount of at least $38,532.68 (inclusive of tax).

72.     The Defendants have failed, and continue to fail, to pay Prime for the installation and dismantling of the sidewalk shed at Building No. 18 of the Sidewalk Shed Buildings in the amount of at least $36,442.00.

73.     The Defendants have failed, and continue to fail, to pay Prime for the rental of the sidewalk shed at Building No. 18 of the Sidewalk Shed Buildings for the period from March 21, 2019 until and through January 27, 2021 in the total amount of at least $44,106.74 (inclusive of tax).

74.     The Defendants have failed, and continue to fail, to pay Prime for the installation of the sidewalk shed at Building No. 24 of the Sidewalk Shed Buildings in the amount of at least $50,827.00.

75.     The Defendants have failed, and continue to fail, to pay Prime for the rental of the sidewalk shed at Building No. 24 of the Sidewalk Shed Buildings for the period from January 8, 2020 until and through the present in the total amount of at least $69,172.37 (inclusive of tax).

76.     The Defendants have failed, and continue to fail, to pay Prime for the installation of the sidewalk shed at Building No. 26 of the Sidewalk Shed Buildings in the amount of at least $34,387.00.

77.     The Defendants have failed, and continue to fail, to pay Prime for the rental of the sidewalk shed at Building No. 26 of the Sidewalk Shed Buildings for the period from January 16, 2020 until and through the present in the total amount of at least $44,926.56 (inclusive of tax).

78.     Upon information and belief, NYCHA consented to Prime furnishing the above-mentioned labor, materials, equipment and/or services in connection with the Breukelen Houses Project.

**III.     The APS-Prime Pipe Scaffolding Subcontract**

79.     In addition, APS, as general contractor, and Prime, as subcontractor, entered into an oral agreement (the "APS-Prime Pipe Scaffolding Subcontract"), whereby APS was required, among other things, to furnish, install, rent and, subsequently, dismantle pipe scaffolding for the

13

following thirteen (13) buildings at the Breukelen Houses Project (the "Pipe Scaffolding Buildings"):

 (i)  Building No. 2;
 (ii)  Building No. 3;
 (iii)  Building No. 4;
 (iv)  Building No. 5;
 (v)  Building No. 6;
 (vi)  Building No. 7;
 (vii)  Building No. 13;
 (viii)  Building No. 15;
 (ix)  Building No. 16;
 (x)  Building No. 17;
 (xi)  Building No. 18;
 (xii)  Building No. 24; and
 (xiii)  Building No. 26;

80. Pursuant to the APS-Prime Pipe Scaffolding Subcontract, Prime's rate for the *installation* of pipe scaffolding at the Pipe Scaffolding Buildings was $10.00 per *square* foot.

81. Pursuant to the APS-Prime Pipe Scaffolding Subcontract, Prime's *monthly* rate for the *rental* of the installed pipe scaffolding at the Pipe Scaffolding Buildings was 5% from the total cost of the installed pipe scaffolding, plus tax.

82. After entering into the APS-Prime Pipe Scaffolding Subcontract, APS and/or Mr. Blazeski furnished Prime with the following square footage for each of the Pipe Scaffolding Buildings:

 (i)  Building No. 2 – 9,972.00 square feet;
 (ii)  Building No. 3 – 9,972.00 square feet;
 (iii)  Building No. 4 – 10,062.00 square feet;
 (iv)  Building No. 5 – 7,722.00 square feet;
 (v)  Building No. 6 – 10,252.80 square feet;
 (vi)  Building No. 7 – 10,252.80 square feet;
 (vii)  Building No. 13 – 9,972.00 square feet;
 (viii)  Building No. 15 – 10,062.00 square feet;
 (ix)  Building No. 16 – 7,722.00 square feet;
 (x)  Building No. 17 – 9,072.00 square feet;
 (xi)  Building No. 18 – 7,920.00 square feet;
 (xii)  Building No. 24 – 9,954.00 square feet; and

(xiii)   Building No. 26 – 9,954.00 square feet.

83.   On or before October 3, 2018, Prime duly installed 9,972.00 square feet of pipe scaffolding at Building No. 2 of the Pipe Scaffolding Buildings.

84.   On or before October 3, 2018, Prime duly installed 9,972.00 square feet of pipe scaffolding at Building No. 3 of the Pipe Scaffolding Buildings.

85.   On or before October 3, 2018, Prime duly installed 10,062.00 square feet of pipe scaffolding at Building No. 4 of the Pipe Scaffolding Buildings.

86.   On or before October 3, 2018, Prime duly installed 7,722.00 square feet of pipe scaffolding at Building No. 5 of the Pipe Scaffolding Buildings.

87.   On or before December 30, 2019, Prime duly installed 10,252.80 square feet of pipe scaffolding at Building No. 6 of the Pipe Scaffolding Buildings.

88.   On or before December 30, 2019, Prime duly installed 10,252.80 square feet of pipe scaffolding at Building No. 7 of the Pipe Scaffolding Buildings.

89.   On or before December 30, 2019, Prime duly installed 9,972.00 square feet of pipe scaffolding at Building No. 13 of the Pipe Scaffolding Buildings.

90.   On or before October 3, 2018, Prime duly installed 10,062.00 square feet of pipe scaffolding at Building No. 15 of the Pipe Scaffolding Buildings.

91.   On or before October 3, 2018, Prime duly installed 7,722.00 square feet of pipe scaffolding at Building No. 16 of the Pipe Scaffolding Buildings.

92.   On or before January 16, 2019, Prime duly installed 9,072.00 square feet of pipe scaffolding at Building No. 17 of the Pipe Scaffolding Buildings.

93.   On or before January 16, 2019, Prime duly installed 7,920.00 square feet of pipe scaffolding at Building No. 18 of the Pipe Scaffolding Buildings.

4875-9776-8459, v. 3

94.     On or before December 30, 2019, Prime duly installed 9,954.00 square feet of pipe scaffolding at Building No. 24 of the Pipe Scaffolding Buildings.

95.     On or before December 30, 2019, Prime duly installed 9,972.00 square feet of pipe scaffolding at Building No. 26 of the Pipe Scaffolding Buildings.

96.     On or about September 9, 2020, the installed pipe scaffolding at Building No. 2 of the Pipe Scaffolding Buildings was duly dismantled.

97.     On or about September 23, 2020, the installed pipe scaffolding at Building No. 3 of the Pipe Scaffolding Buildings was duly dismantled.

98.     On or about October 7, 2020, the installed pipe scaffolding from Building No. 4 of the Pipe Scaffolding Buildings was duly dismantled.

99.     On or about October 22, 2020, the installed pipe scaffolding from Building No. 5 of the Pipe Scaffolding Buildings was duly dismantled.

100.    On or about November 3, 2020, the installed pipe scaffolding from Building No. 15 of the Pipe Scaffolding Buildings was duly dismantled.

101.    On or about November 5, 2020, the installed pipe scaffolding from Building No. 16 of the Pipe Scaffolding Buildings was duly dismantled.

102.    On or about December 10, 2020, the installed pipe scaffolding from Building No. 17 of the Pipe Scaffolding Buildings was duly dismantled.

103.    On or about December 22, 2020, the installed pipe scaffolding from Building No. 18 of the Pipe Scaffolding Buildings was duly dismantled.

104.    To date, the installed pipe scaffolding at Building No. 6 of the Pipe Scaffolding Buildings has not been dismantled and remains to be in use.

105.    To date, the installed pipe scaffolding at Building No. 7 of the Pipe Scaffolding

Buildings has not been dismantled and remains to be in use.

106.    To date, the installed pipe scaffolding at Building No. 13 of the Pipe Scaffolding Buildings has not been dismantled and remains to be in use.

107.    To date, the installed pipe scaffolding at Building No. 24 of the Pipe Scaffolding Buildings has not been dismantled and remains to be in use.

108.    To date, the installed pipe scaffolding at Building No. 26 of the Pipe Scaffolding Buildings has not been dismantled and remains to be in use.

109.    The Defendants have failed, and continue to fail, to pay Prime for the installation and dismantling of pipe scaffolding at Building No. 2 of the Pipe Scaffolding Buildings in the amount of at least $99,720.00.

110.    The Defendants have failed, and continue to fail, to pay Prime for the rental of pipe scaffolding at Building No. 2 of the Pipe Scaffolding Buildings for the period from March 21, 2019 until and through September 9, 2020 in the total amount of at least $95,903.63 (inclusive of tax)

111.    The Defendants have failed, and continue to fail, to pay Prime for the installation and dismantling of pipe scaffolding at Building No. 3 of the Pipe Scaffolding Buildings in the amount of at least $99,720.00.

112.    The Defendants have failed, and continue to fail, to pay Prime for the rental of pipe scaffolding at Building No. 3 of the Pipe Scaffolding Buildings for the period from March 21, 2019 until and through September 23, 2020 in the total amount of at least $98,255.99 (inclusive of tax).

113.    The Defendants have failed, and continue to fail, to pay Prime for the installation and dismantling of pipe scaffolding at Building No. 4 of the Pipe Scaffolding Buildings in the

4875-9776-8459, v. 3

amount of at least $100,620.00.

114.    The Defendants have failed, and continue to fail, to pay Prime for the rental of pipe scaffolding at Building No. 4 of the Pipe Scaffolding Buildings for the period from March 21, 2019 until and through October 7, 2020 in the total amount of at least $101,698.94 (inclusive of tax).

115.    The Defendants have failed, and continue to fail, to pay Prime for the installation and dismantling of pipe scaffolding at Building No. 5 of the Pipe Scaffolding Buildings in the amount of at least $77,220.00.

116.    The Defendants have failed, and continue to fail, to pay Prime for the rental of pipe scaffolding at Building No. 5 of the Pipe Scaffolding Buildings for the period from March 21, 2019 until and through October 22, 2020 in the total amount of at least $80,149.86 (inclusive of tax).

117.    The Defendants have failed, and continue to fail, to pay Prime for the installation of pipe scaffolding at Building No. 6 of the Pipe Scaffolding Buildings in the amount of at least $102,528.00.

118.    The Defendants have failed, and continue to fail, to pay Prime for the rental of pipe scaffolding at Building No. 6 of the Pipe Scaffolding Buildings for the period from April 1, 2020 until and through the present in the total amount of at least $119,374.25 (inclusive of tax).

119.    The Defendants have failed, and continue to fail, to pay Prime for the installation of pipe scaffolding at Building No. 7 of the Pipe Scaffolding Buildings in the amount of at least $102,528.00.

120.    The Defendants have failed, and continue to fail, to pay Prime for the rental of pipe scaffolding at Building No. 7 of the Pipe Scaffolding Buildings for the period from April 1, 2020

4875-9776-8459, v. 3

until and through the present in the total amount of at least $119,374.25 (inclusive of tax).

121.    The Defendants have failed, and continue to fail, to pay Prime for the installation of pipe scaffolding at Building No. 13 of the Pipe Scaffolding Buildings in the amount of at least $99,720.00.

122.    The Defendants have failed, and continue to fail, to pay Prime for the rental of pipe scaffolding at Building No. 13 of the Pipe Scaffolding Buildings for the period from April 1, 2020 until and through the present in the total amount of at least $119,221.39 (inclusive of tax).

123.    The Defendants have failed, and continue to fail, to pay Prime for the installation and dismantling of pipe scaffolding at Building No. 15 of the Pipe Scaffolding Buildings in the amount of at least $100,620.00.

124.    The Defendants have failed, and continue to fail, to pay Prime for the rental of pipe scaffolding at Building No. 15 of the Pipe Scaffolding Buildings for the period from March 21, 2019 until and through December 3, 2020 in the total amount of at least $111,741.03 (inclusive of tax).

125.    The Defendants have failed, and continue to fail, to pay Prime for the installation and dismantling of pipe scaffolding at Building No. 16 of the Pipe Scaffolding Buildings in the amount of at least $77,220.00.

126.    The Defendants have failed, and continue to fail, to pay Prime for the rental of pipe scaffolding at Building No. 16 of the Pipe Scaffolding Buildings for the period from March 21, 2019 until and through December 3, 2020 in the total amount of at least $85,894.86 (inclusive of tax).

127.    The Defendants have failed, and continue to fail, to pay Prime for the installation and dismantling of pipe scaffolding at Building No. 17 of the Pipe Scaffolding Buildings in the

4875-9776-8459, v. 3

amount of at least $90,720.00.

128.    The Defendants have failed, and continue to fail, to pay Prime for the rental of pipe scaffolding at Building No. 17 of the Pipe Scaffolding Buildings for the period from April 17, 2019 until and through December 23, 2020 in the total amount of at least $99,923.73 (inclusive of tax).

129.    The Defendants have failed, and continue to fail, to pay Prime for the installation and dismantling of pipe scaffolding at Building No. 18 of the Pipe Scaffolding Buildings in the amount of at least $79,200.00.

130.    The Defendants have failed, and continue to fail, to pay Prime for the rental of pipe scaffolding at Building No. 18 of the Pipe Scaffolding Buildings for the period from April 17, 2019 until and through December 22, 2020 in the total amount of at least $87,091.29 (inclusive of tax).

131.    The Defendants have failed, and continue to fail, to pay Prime for the installation of pipe scaffolding at Building No. 24 of the Pipe Scaffolding Buildings in the amount of at least $99,540.00.

132.    The Defendants have failed, and continue to fail, to pay Prime for the rental of pipe scaffolding at Building No. 24 of the Pipe Scaffolding Buildings for the period from April 1, 2020 until and through the present in the total amount of at least $101,510.48 (inclusive of tax).

133.    The Defendants have failed, and continue to fail, to pay Prime for the installation of pipe scaffolding at Building No. 26 of the Pipe Scaffolding Buildings in the amount of at least $99,540.00.

134.    The Defendants have failed, and continue to fail, to pay Prime for the rental of pipe scaffolding at Building No. 26 of the Pipe Scaffolding Buildings for the period from April 1, 2020

4875-9776-8459, v. 3

until and through the present in the total amount of at least $101,510.48 (inclusive of tax).

135.    Upon information and belief, NYCHA consented to Prime furnishing the above-mentioned labor, materials, equipment and/or services in connection with the Breukelen Houses Project.

**IV.    Settlement Agreement**

136.    Prior to March 15, 2019, at the express request of APS and/or Mr. Blazeski, Prime provided certain labor to APS in connection with the Breukelen Houses Project.

137.    As part of this agreement, APS and/or Mr. Blazeski agreed to pay Prime for the provided labor.

138.    APS and/or Mr. Blazeski failed to pay Prime for the provided labor in full.

139.    As a result, Prime submitted a claim (the "Claim") with NASIC for the amount of the unpaid labor.

140.    Or about March 15, 2019, NASIC and Prime entered into a settlement agreement, whereby, *inter alia*, NASIC paid Prime $876,000.00 for the Claim in exchange for Prime releasing NASIC from the Claim.

**COUNT ONE**
**(Breach of the APS-Prime Sidewalk Shed Subcontract against APS and Mr. Blazeski)**

141.    Prime repeats and re-alleges each and every allegation set forth in Paragraphs "1" through "140" of this Verified Complaint as if fully set forth herein.

142.    APS and Prime duly entered into the APS-Prime Sidewalk Shed Subcontract.

143.    The APS-Prime Sidewalk Shed Subcontract is valid and enforceable.

144.    The APS-Prime Sidewalk Shed Subcontract, as duly modified by the parties, required Prime to, among other things, furnish, install, rent and, subsequently, dismantle sidewalk sheds the Sidewalk Shed Buildings.

145.    In addition, the APS-Prime Sidewalk Shed Subcontract, as duly modified by the parties, required APS to pay Prime: (i) at the rate of $137.00 per *linear* foot for the *installation* of sidewalk sheds at the Sidewalk Shed Buildings; and (ii) at the rate of 5% from the total cost of the installed sidewalk sheds, plus tax, for the monthly *rental* of the installed sidewalk sheds at the Sidewalk Shed Buildings.

146.    Prime duly performed the APS-Prime Sidewalk Shed Subcontract, as duly modified by the parties, by furnishing, installing, renting and, where applicable, partially dismantling the sidewalk sheds at the Sidewalk Shed Buildings.

147.    APS materially breached the APS-Prime Sidewalk Shed Subcontract, as duly modified by the parties, by, among other things, failing to pay Prime for the furnishing installation, rental and, where applicable, partial dismantling of the sidewalk sheds at the Sidewalk Shed Buildings.

148.    As a result of the foregoing material breaches by APS, Prime has been, and continues to be, damaged in that APS failed, and continues to fail, to pay Prime for the furnishing installation, rental and, where applicable, partial dismantling of the sidewalk sheds at the Sidewalk Shed Buildings.

149.    Upon information and belief, at all times relevant to this Action, Mr. Blazeski was the President, owner, principal, officer and/or director of APS.

150.    In that capacity, Mr. Blazeski single-handedly negotiated the APS-Prime Sidewalk Shed Subcontract, and all the modifications thereto, on behalf of APS and directed Prime to, among other things, furnish, install, rent and, subsequently, dismantle sidewalk sheds at the Sidewalk Shed Buildings.

151.    By way of the foregoing, Mr. Blazeski exercised complete control and domination

of APS with respect to the APS-Prime Sidewalk Shed Subcontract and all the modifications thereto.

152. Mr. Blazeski's complete control and domination of APS with respect to the APS-Prime Sidewalk Shed Subcontract, and all the modifications thereto, was used to fraudulently induce Prime to enter into the APS-Prime Sidewalk Shed Subcontract, and all the modifications thereto.

153. As a result of being fraudulently induced by Mr. Blazeski to enter into the APS-Prime Sidewalk Shed Subcontract, and all the modifications thereto, Prime has been, and continues to be, damaged in that APS failed, and continues to fail, to pay Prime for the furnishing, installation, rental and, where applicable, partial dismantling of the sidewalk sheds at the Sidewalk Shed Buildings.

154. For the foregoing reasons, APS and Mr. Blazeski are jointly and severally liable to Prime in an amount to be determined at trial, but believed to be no less than **$1,355,512.23**, plus costs, including legal fees, disbursements and interest.

## COUNT TWO
### (*Quantum Meruit* against APS and Mr. Blazeski – Sidewalk Shed)

155. Prime repeats and re-alleges each and every allegation set forth in Paragraphs "1" through "130" of this Verified Complaint as if fully set forth herein.

156. APS and/or Mr. Blazeski requested Prime to, among other things, furnish, install, rent and, subsequently, dismantle sidewalk sheds at the Sidewalk Shed Buildings.

157. The agreed-upon rate for Prime's *installation* of sidewalk sheds at the Sidewalk Shed Buildings was $137.00 per *linear* foot.

158. The agreed-upon rate for Prime's monthly *rental* of the installed sidewalk sheds at the Sidewalk Shed Buildings was 5% from the total cost of the installed sidewalk sheds, plus tax.

159.   Prime duly and in good faith furnished, installed, rented and, where applicable, partially dismantled the sidewalk sheds at the Sidewalk Shed Buildings.

160.   Without objection, APS and/or Mr. Blazeski accepted Prime's furnishing, installation, rental and, where applicable, partial dismantling of the sidewalk sheds at the Sidewalk Shed Buildings.

161.   Prime reasonably expected to be paid by APS and/or Mr. Blazeski for the furnishing, installation, rental and, where applicable, partial dismantling of the sidewalk sheds at the Sidewalk Shed Buildings (i) at the agreed-upon rate of $137.00 per *linear* foot for the *installation* of sidewalk sheds at the Sidewalk Shed Buildings; and (ii) at the agreed-upon rate of 5% from the total cost of the installed sidewalk sheds, plus tax, for the monthly *rental* of the installed sidewalk sheds at the Sidewalk Shed Buildings.

162.   The reasonable value of Prime's furnishing, installation, rental and, where applicable, partial dismantling of the sidewalk sheds at the Sidewalk Shed Buildings is (i) $137.00 per *linear* foot for the *installation* of sidewalk sheds at the Sidewalk Shed Buildings; and (ii) 5% from the total cost of the installed sidewalk sheds, tax, for the monthly *rental* of the installed sidewalk sheds at the Sidewalk Shed Buildings.

163.   APS and/or Mr. Blazeski failed, and continues to fail, to pay Prime for the furnishing, installation, rental and, where applicable, partial dismantling of the sidewalk sheds at the Sidewalk Shed Buildings.

164.   For the foregoing reasons, APS and Mr. Blazeski are jointly and severally liable to Prime in an amount to be determined at trial, but believed to be no less than **$1,355,512.23**, plus costs, including legal fees, disbursements and interest.

### **COUNT THREE**
**(Unjust Enrichment against APS and Mr. Blazeski – Sidewalk Shed)**

4875-9776-8459, v. 3

165.     Prime repeats and re-alleges each and every allegation set forth in Paragraphs "1" through "140" of this Verified Complaint as if fully set forth herein.

166.     APS and/or Mr. Blazeski requested Prime to, among other things, furnish, install, rent and, subsequently, dismantle sidewalk sheds at the Sidewalk Shed Buildings.

167.     The agreed-upon rate for Prime's *installation* of sidewalk sheds at the Sidewalk Shed Buildings was $137.00 per *linear* foot.

168.     The agreed-upon rate for Prime's monthly *rental* of the installed sidewalk sheds at the Sidewalk Shed Buildings was 5% from the total cost of the installed sidewalk sheds, plus tax.

169.     Prime duly and in good faith furnished, installed, rented and, where applicable, partially dismantled the sidewalk sheds at the Sidewalk Shed Buildings.

170.     Without objection, APS and/or Mr. Blazeski accepted Prime's furnishing, installation, rental and, where applicable, partial dismantling of the sidewalk sheds at the Sidewalk Shed Buildings.

171.     Prime reasonably expected to be paid by APS and/or Mr. Blazeski for the furnishing, installation, rental and, where applicable, partial dismantling of the sidewalk sheds at the Sidewalk Shed Buildings (i) at the agreed-upon rate of $137.00 per *linear* foot for the *installation* of sidewalk sheds at the Sidewalk Shed Buildings; and (ii) at the agreed-upon rate of 5% from the total cost of the installed sidewalk sheds, plus tax, for the monthly *rental* of the installed sidewalk sheds at the Sidewalk Shed Buildings.

172.     The reasonable value of Prime's furnishing, installation, rental and, where applicable, partial dismantling of the sidewalk sheds at the Sidewalk Shed Buildings is (i) $137.00 per *linear* foot for the *installation* of sidewalk sheds at the Sidewalk Shed Buildings; and (ii) 5% from the total cost of the installed sidewalk sheds, plus tax, for the monthly *rental* of the installed

sidewalk sheds at the Sidewalk Shed Buildings.

173.    APS and/or Mr. Blazeski failed, and continues to fail, to pay Prime for the furnishing, installation, rental and, where applicable, partial dismantling of the sidewalk sheds at the Sidewalk Shed Buildings.

174.    As a result of APS and/or Mr. Blazeski's continued failure to pay Prime for the furnishing, installation, rental and, where applicable, partial dismantling of the sidewalk sheds at the Sidewalk Shed Buildings, APS and Mr. Blazeski were enriched at Prime's expense.

175.    It is against equity and good conscious to permit APS and Mr. Blazeski to continue not paying Prime for the furnishing, installation, rental and, where applicable, partial dismantling of the sidewalk sheds at the Sidewalk Shed Buildings.

176.    For the foregoing reasons, APS and Mr. Blazeski are jointly and severally liable to Prime in an amount to be determined at trial, but believed to be no less than **$1,355,512.23**, plus costs, including legal fees, disbursements and interest.

## COUNT FOUR
### (Account Stated against APS and Mr. Blazeski – Sidewalk Shed)

177.    Prime repeats and re-alleges each and every allegation set forth in Paragraphs "1" through "152" of this Verified Complaint as if fully set forth herein.

178.    Prime invoiced APS and/or Mr. Blazeski for the furnishing, installation, rental and, where applicable, partial dismantling of the sidewalk sheds at the Sidewalk Shed Buildings (i) at the agreed-upon rate of $137.00 per *linear* foot for the *installation* of sidewalk sheds at the Sidewalk Shed Buildings; and (ii) at the agreed-upon rate of 5% from the total cost of the installed sidewalk sheds, plus tax, for the monthly *rental* of the installed sidewalk sheds at the Sidewalk Shed Buildings.

179.    Without objection, APS and/or Mr. Blazeski accepted all of Prime's afore-

mentioned invoices as correct.

180.    APS and/or Mr. Blazeski promised Prime to pay all of the aforementioned invoices.

181.    For the foregoing reasons, APS and Mr. Blazeski are jointly and severally liable to Prime in an amount to be determined at trial, but believed to be no less than **$1,355,512.23**, plus costs, including legal fees, disbursements and interest.

## COUNT FIVE
**(Breach of the APS-Prime Pipe Scaffolding Contract against APS and Mr. Blazeski)**

182.    Prime repeats and re-alleges each and every allegation set forth in Paragraphs "1" through "157" of this Verified Complaint as if fully set forth herein.

183.    APS and Prime duly entered into the APS-Prime Pipe Scaffolding Subcontract.

184.    The APS-Prime Pipe Scaffolding Subcontract is valid and enforceable.

185.    The APS-Prime Pipe Scaffolding Subcontract required Prime to, among other things, furnish, install, rent and, subsequently, dismantle pipe scaffolding at the Pipe Scaffolding Buildings.

186.    In addition, the APS-Prime Pipe Scaffolding Subcontract required APS to pay Prime: (i) at the rate of $10.00 per *square* foot for the *installation* of pipe scaffolding at the Pipe Scaffolding Buildings; and (ii) at the rate of 5% from the total cost of the installed pipe scaffolding, plus tax, for the monthly *rental* of the installed pipe scaffolding at the Pipe Scaffolding Buildings.

187.    Prime duly performed the APS-Prime Pipe Scaffolding Subcontract by furnishing, installing, renting and, where applicable, partially dismantling the pipe scaffolding at the Pipe Scaffolding Buildings.

188.    APS materially breached the APS-Prime Pipe Scaffolding Subcontract by, among other things, failing to pay Prime for the furnishing, installation, rental and, where applicable, partial dismantling of the pipe scaffolding at the Pipe Scaffolding Buildings.

4875-9776-8459, v. 3

189.    As a result of the foregoing material breaches by APS, Prime has been, and continues to be, damaged in that APS failed, and continues to fail, to pay Prime for the furnishing, installation, rental and, where applicable, partial dismantling of the pipe scaffolding at the Pipe Scaffolding Buildings.

190.    Upon information and belief, at all times relevant to this Action, Mr. Blazeski was the President, owner, principal, officer and/or director of APS.

191.    In that capacity, Mr. Blazeski single-handedly negotiated the APS-Prime Pipe Scaffolding Subcontract on behalf of APS and directed Prime to, among other things, furnish, install, rent and, subsequently, dismantle pipe scaffolding at the Pipe Scaffolding Buildings.

192.    By way of the foregoing, Mr. Blazeski exercised complete control and domination of APS with respect to the APS-Prime Pipe Scaffolding Subcontract.

193.    Mr. Blazeski's complete control and domination of APS with respect to the APS-Prime Pipe Scaffolding Subcontract, and all the modifications thereto, was used to fraudulently induce Prime to enter into the APS-Prime Pipe Scaffolding Subcontract.

194.    As a result of being fraudulently induced by Mr. Blazeski to enter into the APS-Prime Pipe Scaffolding Subcontract, Prime has been, and continues to be, damaged in that APS failed, and continues to fail, to pay Prime for the furnishing, installation, rental and, where applicable, partial dismantling of the pipe scaffolding at the Pipe Scaffolding Buildings.

195.    For the foregoing reasons, APS and Mr. Blazeski are jointly and severally liable to Prime in an amount to be determined at trial, but believed to be no less than **$2,550,546.18**, plus costs, including legal fees, disbursements and interest.

**COUNT SIX**
**(*Quant Meruit* against APS and Mr. Blazeski – Pipe Scaffolding)**

196.    Prime repeats and re-alleges each and every allegation set forth in Paragraphs "1"
through "171" of this Verified Complaint as if fully set forth herein.

197.    APS and/or Mr. Blazeski requested Prime to, among other things, furnish, install,
rent and, subsequently, dismantle pipe scaffolding at the Pipe Scaffolding Buildings.

198.    The agreed-upon rate for Prime's *installation* of pipe scaffolding at the Pipe
Scaffolding Buildings was $10.00 per *square* foot.

199.    The agreed-upon rate for Prime's monthly *rental* of the installed pipe scaffolding
at the Pipe Scaffolding Buildings was 5% from the total cost of the installed pipe scaffolding, plus
tax.

200.    Prime duly and in good faith furnished, installed, rented and, where applicable,
partially dismantled the pipe scaffolding at the Pipe Scaffolding Buildings.

201.    Without objection, APS and/or Mr. Blazeski accepted Prime's furnishing,
installation, rental and, where applicable, partial dismantling of the pipe scaffolding at the Pipe
Scaffolding Buildings.

202.    Prime reasonably expected to be paid by APS and/or Mr. Blazeski for the
furnishing, installation, rental and, where applicable, partial dismantling of the pipe scaffolding at
the Pipe Scaffolding Buildings (i) at the agreed-upon rate of $10.00 per *square* foot for the
*installation* of pipe scaffolding at the Pipe Scaffolding Buildings; and (ii) at the agreed-upon rate
of 5% from the total cost of the installed pipe scaffolding, plus tax, for the monthly *rental* of the
installed sidewalk sheds at the Pipe Scaffolding Buildings.

203.    The reasonable value of Prime's furnishing, installation, rental and, where
applicable, partial dismantling of the pipe scaffolding at the Pipe Scaffolding Buildings is (i)

4875-9776-8459, v. 3

$10.00 per *square* foot for the *installation* of pipe scaffolding at the Pipe Scaffolding Buildings; and (ii) 5% from the total cost of the installed pipe scaffolding, plus tax, for the monthly *rental* of the installed pipe scaffolding at the Pipe Scaffolding Buildings.

204.    APS and/or Mr. Blazeski failed, and continues to fail, to pay Prime for the furnishing, installation, rental and, where applicable, partial dismantling of the pipe scaffolding at the Pipe Scaffolding Buildings.

205.    For the foregoing reasons, APS and Mr. Blazeski are jointly and severally liable to Prime in an amount to be determined at trial, but believed to be no less than **$2,550,546.18**, plus costs, including legal fees, disbursements and interest.

## COUNT SEVEN
### (Unjust Enrichment against APS and Mr. Blazeski – Pipe Scaffolding)

206.    Prime repeats and re-alleges each and every allegation set forth in Paragraphs "1" through "181" of this Verified Complaint as if fully set forth herein.

207.    APS and/or Mr. Blazeski requested Prime to, among other things, furnish, install, rent and, subsequently, dismantle pipe scaffolding at the Pipe Scaffolding Buildings.

208.    The agreed-upon rate for Prime's *installation* of pipe scaffolding at the Pipe Scaffolding Buildings was $10.00 per *square* foot.

209.    The agreed-upon rate for Prime's monthly *rental* of the installed pipe scaffolding at the Pipe Scaffolding Buildings was 5% from the total cost of the installed pipe scaffolding, plus tax.

210.    Prime duly and in good faith furnished, installed, rented and, where applicable, partially dismantled the pipe scaffolding at the Pipe Scaffolding Buildings.

211.    Without objection, APS and/or Mr. Blazeski accepted Prime's furnishing, installation, rental and, where applicable, partial dismantling of the pipe scaffolding at the Pipe

4875-9776-8459, v. 3

Scaffolding Buildings.

212. Prime reasonably expected to be paid by APS and/or Mr. Blazeski for the furnishing, installation, rental and, where applicable, partial dismantling of the pipe scaffolding at the Pipe Scaffolding Buildings (i) at the agreed-upon rate of $10.00 per *square* foot for the *installation* of pipe scaffolding at the Pipe Scaffolding Buildings; and (ii) at the agreed-upon rate of 5% from the total cost of the installed pipe scaffolding, plus tax, for the monthly *rental* of the installed sidewalk sheds at the Pipe Scaffolding Buildings.

213. The reasonable value of Prime's furnishing, installation, rental and, where applicable, partial dismantling of the pipe scaffolding at the Pipe Scaffolding Buildings is (i) $10.00 per *square* foot for the *installation* of pipe scaffolding at the Pipe Scaffolding Buildings; and (ii) 5% from the total cost of the installed pipe scaffolding, plus tax, for the monthly *rental* of the installed pipe scaffolding at the Pipe Scaffolding Buildings.

214. APS and/or Mr. Blazeski failed, and continues to fail, to pay Prime for the furnishing, installation, rental and, where applicable, partial dismantling of the pipe scaffolding at the Pipe Scaffolding Buildings.

215. As a result of APS and/or Mr. Blazeski's continued failure to pay Prime for the furnishing, installation, rental and, where applicable, partial dismantling of the pipe scaffolding at the Pipe Scaffolding Buildings, APS and Mr. Blazeski were enriched at Prime's expense.

216. It is against equity and good conscious to permit APS and Mr. Blazeski to continue not paying Prime for the furnishing, installation, rental and, where applicable, partial dismantling of the pipe scaffolding at the Pipe Scaffolding Buildings.

217. For the foregoing reasons, APS and Mr. Blazeski are jointly and severally liable to Prime in an amount to be determined at trial, but believed to be no less than **$2,550,546.18**, plus

costs, including legal fees, disbursements and interest.

**COUNT EIGHT**
**(Account Stated against APS and Mr. Blazeski – Pipe Scaffolding)**

218.    Prime repeats and re-alleges each and every allegation set forth in Paragraphs "1" through "193" of this Verified Complaint as if fully set forth herein.

219.    Prime invoiced APS and/or Mr. Blazeski for the furnishing, installation, rental and, where applicable, partial dismantling of the pipe scaffolding at the Pipe Scaffolding Buildings (i) at the agreed-upon rate of $10.00 per *linear* foot for the *installation* of pipe scaffolding at the Pipe Scaffolding Buildings; and (ii) at the agreed-upon rate of 5% from the total cost of the installed pipe scaffolding, plus tax, for the monthly *rental* of the installed pipe scaffolding at the Pipe Scaffolding Buildings.

220.    Without objection, APS and/or Mr. Blazeski accepted all of Prime's afore-mentioned invoices as correct.

221.    APS and/or Mr. Blazeski promised Prime to pay all of the aforementioned invoices.

222.    For the foregoing reasons, APS and Mr. Blazeski are jointly and severally liable to Prime in an amount to be determined at trial, but believed to be no less than **$2,550,546.18**, plus costs, including legal fees, disbursements and interest.

**COUNT NINE**
**(Breach of Bond No. 1 against NASIC)**

223.    Prime repeats and re-alleges each and every allegation set forth in Paragraphs "1" through "198" of this Verified Complaint as if fully set forth herein.

224.    Prime is a beneficiary and/or claimant of Bond No. 1 and is expressly afforded a direct right of action thereunder.

4875-9776-8459, v. 3

225.    Upon information and belief, the Breukelen Houses Project is ongoing and two years have not elapsed since the complete performance of the NYCHA-APS Contract and final settlement thereof.

226.    Prime has satisfied all applicable conditions precedent to the commencement of this Action against NAS, if any.

227.    The total value of labor performed and materials, equipment and/or services Prime furnished in connection with the Breukelen Houses Project, which remains unpaid, is at least $3,906,058.41.

228.    Despite due demands, NASIC has failed to make payment to Prime as required under Bond No. 1, leaving the sum of at least $3,906,058.41 due and owing to Prime.

229.    NASIC's failure to make payment to Prime constitutes a material breach of Bond No. 1.

230.    By reason of the foregoing, NASIC is liable to Prime in an amount to be determined at trial, but believed to be no less than **$3,906,058.41**, plus costs, including legal fees, disbursements and interest.

<u>**COUNT TEN**</u>
**(Breach of Bond No. 2 against NASIC)**

231.    Prime repeats and re-alleges each and every allegation set forth in Paragraphs "1" through "206" of this Verified Complaint as if fully set forth herein.

232.    Prime is a beneficiary and/or claimant of Bond No. 2 and is expressly afforded a direct right of action thereunder.

233.    Upon information and belief, the Breukelen Houses Project is ongoing and two years have not elapsed since the complete performance of the NYCHA-APS Contract and final settlement thereof.

4875-9776-8459, v. 3

234.    Prime has satisfied all applicable conditions precedent to the commencement of this Action against NAS, if any.

235.    The total value of labor performed and materials, equipment and/or services Prime furnished in connection with the Breukelen Houses Project, which remains unpaid, is at least $3,906,058.41.

236.    Despite due demands, NASIC has failed to make payment to Prime as required under Bond No. 2, leaving the sum of at least $3,906,058.41 due and owing to Prime.

237.    NASIC's failure to make payment to Prime constitutes a material breach of Bond No. 2.

238.    By reason of the foregoing, NASIC is liable to Prime in an amount to be determined at trial, but believed to be no less than **$3,906,058.41**, plus costs, including legal fees, disbursements and interest.

## **COUNT ELEVEN**
**(Attorneys' Fees against NASIC)**

239.    Prime repeats and re-alleges each and every allegation set forth in Paragraphs "1" through "214" of this Complaint as if fully set forth herein.

240.    Prime has incurred and will continue to incur attorneys' fees in connection with the prosecution of this Action.

241.    Pursuant to New York State Finance Law § 137, NASIC is liable for the attorneys' fees incurred and to be incurred by Prime in the prosecution of this Action.

242.    By reason of the foregoing, NASIC are liable to Prime for attorneys' fees interest pursuant to New York State Finance Law § 137.

**WHEREFORE**, Prime respectfully demands judgment as follows:

A. On Count One, awarding damages in favor of Prime, in an amount to be determined at trial, but in no event less than **$1,355,512.23** plus costs, including attorneys' fees, disbursements and interest;

B. On Count Two, awarding damages in favor of Prime, in an amount to be determined at trial, but in no event less than **$1,355,512.23**, plus costs, including attorneys' fees, disbursements and interest;

C. On Count Three, awarding damages in favor of Prime, in an amount to be determined at trial, but in no event less than **$1,355,512.23**, plus costs, including attorneys' fees, disbursements and interest;

D. On Count Four, awarding damages in favor of Prime, in an amount to be determined at trial, but in no event less than **$1,355,512.23**, plus costs, including attorneys' fees, disbursements and interest;

E. On Count Five, awarding damages in favor of Prime, in an amount to be determined at trial, but in no event less than **$2,550,546.18**, plus costs, including attorneys' fees, disbursements and interest;

F. On Count Six, awarding damages in favor of Prime, in an amount to be determined at trial, but in no event less than **$2,550,546.18**, plus costs, including attorneys' fees, disbursements and interest;

G. On Count Seven, awarding damages in favor of Prime, in an amount to be determined at trial, but in no event less than **$2,550,546.18**, plus costs, including attorneys' fees, disbursements and interest;

H. On Count Eight, awarding damages in favor of Prime, in an amount to be determined at trial, but in no event less than **$2,550,546.18**, plus costs, including attorneys' fees, disbursements and interest;

I. On Count Nine, awarding damages in favor of Prime, in an amount to be determined at trial, but in no event less than **$3,906,058.41**, plus costs, including attorneys' fees, disbursements and interest;

J. On Count Ten, awarding damages in favor of Prime, in an amount to be determined at trial, but in no event less than **$3,906,058.41**, plus costs, including attorneys' fees, disbursements and interest;

K. On Count Eleven, awarding attorneys' fees in an amount to be determined at trial, but in no event less than **$100,000.00**, plus costs, including attorneys' fees, disbursements and interest; and

L. Granting Prime such other and further relief as the Court deems just and proper.

Dated: Mineola, New York
March 22, 2022

**MELTZER LIPPE, GOLDSTEIN &
BREITSTONE, LLP**
*Attorneys for Plaintiff*
*Prime Contractors, Inc.*

By:   */s/ Max Rayetsky*
       Manny A. Frade (MF7590)
       Max Rayetsky (MR1986)
The Chancery Building
190 Willis Avenue
Mineola, New York 11501
Telephone: (516) 747-0300
Facsimile: (516) 747-0653
mfrade@meltzerlippe.com
mrayetsky@meltzerlippe.com

To:   **APS CONTRACTORS INC.**
       27 East 33rd Street
       Paterson, New Jersey 07514

       **GOCE BLAZESKI**
       27 East 33rd Street
       Paterson, New Jersey 07514

       **GOCE BLAZESKI**
       424B Van Bussum Avenue
       Garfield, New Jersey 07026

       **GOCE BLAZESKI**
       9 Dykers Farm Road
       North Haledon, New Jersey 07508

       **NORTH AMERICAN SPECIALTY
       INSURANCE COMPANY**
       1650 Market Street
       Philadelphia, Pennsylvania 19106

## VERIFICATION

STATE OF NEW ~~YORK~~ Jersey )

                           ) ss.:

COUNTY OF  Passaic  . )

   **LAKHWINDER SINGH**, being duly sworn, deposes and says:

   I am President of Prime Contractors Inc., the plaintiff in the above-captioned action. I have read the foregoing Verified Complaint and know the contents thereof. The same are true to my knowledge, except as to matters therein stated to be alleged upon information and belief, and, as to those matters, I believe them to be true.

                                      **LAKHWINDER SINGH**

Sworn to before me this
21ˢᵗ day of  March , 2022

_____
    Notary Public

Lorena N. Perez
NOTARY PUBLIC
STATE OF NEW JERSEY
ID # 50082542
MY COMMISSION EXPIRES May 16, 2023